## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

### CIVIL ACTION NO.: \o - 2 7o. CB - M

MICHAEL HENRY SMITH,
                    Plaintiff,

Vs.

BRITISH PETROLEUM AND MORAN ENVIRONMENTAL RECOVERY,
LLC,
                    Defendants.


## LAWSUIT FOR NEGLIGENCE UNDER THE JONES ACT, AND UNSEAWORTHINESS, MAINTENANCE, AND CURE UNDER GENERAL MARITIME LAW, AND PUNITIVE DAMAGES FOR THE WILLFUL AND WANTON REFUSAL TO PROVIDE MEDICAL CARE, CURE AND MAINTENANCE TO A SEAMAN INJURED ON THE JOB

Comes now, the plaintiff to plead that the defendants were each my employer at the

time of my accident.  I worked for the defendants for three days as a seaman/boat

hand until I had an accident at the end of the third day.  After my accident I was

terminated for having the accident: yet I was never allowed to fill in an accident re-

port nor was I ever seen by the Safety Personnel.  When I sought rehire in another

position I was told that I had been blacklisted, and that I could no longer work for

1

the defendants in any capacity, anywhere, in the areas affected by oil spill being generated by Mississippi Canyon 252 (MS 252). This Blacklisting; which pleaded here is liable, slander and restriction of trade; will forever prohibit me from gaining employment in this occupation that I am trained and experienced in: this is a life-long disbarment without any due process attaching or benefits; such as Cure and Maintenance, and Workmen's Compensation Insurance; being made available to me. I have no idea of the extent of my injuries. The actions of the defendants were willful and wanton: they understood well their obligations[1]. The defendants dis-missed me from my job to avoid paying my medical bills and maintenance and cure. The job itself was for 15 hours per day, seven days per week, until the oil spill was controlled. That near term revenue was a significant loss to me in today's economy. I was hired by the defendants through several intermediaries that took exorbitant fees from my wages to provide me to the defendants. Every day prior to boarding the boats I was instructed, by the agents for the defendants, in my person-al duties and given a general Safety Talk. Several times a day the agents for the defendants told me that they were in charge and that I worked for them. This pleading is made in good faith and for good cause set out *infra*. It is not made

---

[1] In the wake of *Vaughan v. Atkinson, 369 U. S. 527 (1962)*, a number of lower courts expressly held that punitive damages can be recovered for the denial of maintenance and cure. See, *e.g.*, *Hines v. J. A. Laporte, Inc.*, 820 F. 2d 1187, 1189 (CA11 1987) *(per curiam)* (upholding punitive damages award of $5,000 for an "arbitrary and bad faith breach of the duty to furnish mainten-ance and cure"); *Robinson v. Pocahontas, Inc.*, 477 F. 2d 1048, 1049– 1052 (CA1 1973) (affirming punitive damages award of $10,000 which was based, in part, on the defendant's initial withholding of maintenance and cure on the pretext that the seaman had been fired for cause). *As cited in, Atlantic Sounding Co. v. Townsend*, 557 U.S. ___ (2009).

merely to vex the defendants or this Honorable Court.  Finally it is made under the penalty of perjury pursuant Title 18, § 1621; and Title 28, § 1746.

## JURISDICTION AND VENUE

The Court has jurisdiction over this action under 40, U.S.C. § 30104, the Jones Act, 46 U.S.C. App. Section 688 *et seq.*, and the general maritime law. Additionally, diversity jurisdiction is present under 28, U.S.C. § 1332(a) because the parties are diverse from the claimant and the amount in controversy exceeds $75,000, excluding interests and costs.  Venue is proper in this district.

## RULES 8 AND 9 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  "[D]etailed factual allegations" are not required, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), at 555, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *id.*, at 570.  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556.

The Supreme Court found in *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.Ct. 1937 (2009), that Rule 9(b), which requires particularity when pleading "fraud or mistake" but allows "other conditions of a person's mind [to] be alleged generally," did not require courts to credit a complaint's conclusory statements without reference to its factual context.  The Supreme Court concluded that the Second Circuit should decide in the first instance whether to remand to the District Court to allow Iqbal to seek leave to amend his deficient complaint.

While I do not have to win this action on the initial pleading[2], I have pleaded, within, the facts necessary to give the defendants fair notice of what my claim is and the grounds upon which it rests.  This has resulted in a slightly longer initial pleading than normal due to the recent rulings of the United States Supreme Court.  This is a non-exhaustive recitation of the known and unknown.  Should the defendants feel that I have failed in this mission they have the option to make specific objections and request this Honorable Court to issue an Order for a more specific pleading.  I do not have to meet the pre-1938 pleading standards.

### STATEMENT OF THE FACTS

From Monday, the 10th of May, 2010, until Wednesday, the 12th of May 2010, I was employed by British Petroleum (BP) and Moran Environmental (Moran) solely

---

[2] *Conley v. Gibson,* 355 US 41, 43, 47-48, 78 S.Ct. 99, 103 (1957)

4

as a full time Seaman/Boat Hand[3].  The boats that I was assigned to transported our crew and supplies in and around the Orange Beach area for the purpose of installing, inspecting and maintaining the Floating Boom (Boom) tasked to protect the areas of Orange Beach from the oil escaping at MS 252.  We did, on two occasions; venture out into the Gulf of Mexico by traversing Perdido Pass/Inlet for the purpose of inspecting and servicing the Boom.  I was spending 100% of my work time on one or the other of these boats[4]: at the direction of BP and Moran.  These boats spent 100% of their time on the water.  During the three days that I worked for the defendants the boats that I worked on were stored on trailers while I was not working on them: they were launched every morning by myself and the other crew members and placed back onto the trailers every evening by myself and the other crew members as part of our regular duties.  My duties on the vessel were, but not limited to, cleaning the vessel, launching and removing the vessel, tying the vessel up to the docks and to other vessels at rest, teaching the other hands general seamanship, holding our vessel away from other vessels and obstacles, stocking provisions for our journeys, making up and breaking down the Boom, deploying the

---

[3] "In order to be a seaman, an individual (among other things) 'must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.' *Harbor Tug and Barge Co. v. Papai* , 117 S.Ct. 1535, 1540 (1997) (quoting *Chandris, Inc. v. Latsis* , 115 S.Ct. 2172, 2179 (1995) (citations and internal quotation marks omitted))." Fields v. Pool Offshore, 182 F.3d 353 (5th Cir 1999).

[4] A vessel is "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. Section  3. In general, the "greater the structure's resemblance to conventional seafaring craft, the greater the odds of securing vessel status". *Gremillionv. Gulf Coast Catering Co.* , 904 F.2d 290, 293 (5th Cir. 1990).  Fields v. Pool Offshore, 182 F.3d 353 (5th Cir 1999).

anchors that held the Boom in place, inspecting the Boom and on one occasion, deploying the anchor. At no time during my term of employment did I ever do any other form of work or have any other work station. At the time of the accident the boat was not moored or anchored or in any way converted to a platform[5].

BP/Moran provided all meals, water, ice and drinks while I was at work. BP/Moran provided transportation to the boats.

On Wednesday, the 12th of May 2010, at approximately 4:15 pm I was working with the other boat hand and the captain of the boat, onboard the "Jet Boat" (Jet), pulling on a connecting line between the Boom and the locating anchor for the Boom. This line was submerged and the anchor was imbedded into the sea bed. I was instructed to kneel down on the deck of the boat and rest my chest and abdomen on the rail while I reached over the side of the boat to grasp the anchor line. The rail of the boat was smooth and wet. My work vest/life jacket was new, slick and wet. The Jet was not anchored and was being buffeted by the wakes of other boats and the rough waters of Perdido Inlet. The boat tipped to our side and my work vest started slipping on the wet railing. I released the anchor line but that did not stop me from sliding over the side of the boat and into the water.

---

[5] "In particular, we have focused on three factors when trying to determine whether a structure is a work platform beyond the realm of the Jones Act. First, we ask whether the structure was constructed to serve primarily as a work platform. Second, we look to whether or not the structure was moored or otherwise secured at the time of the accident. Lastly, we attempt to ascertain whether the transportation function of the structure went beyond theoretical mobility and occasional incidental movement. *See, Burchett v. Cargill, Inc.,* 48 F.3d 173, 176 (5th Cir. 1995)." Fields v. Pool Offshore, 182 F.3d 353 (5th Cir 1999).

This method of retrieving the anchors was the method set out by the boat's captain and it was the method that we had employed during the previous seven anchor lifts. We had an onsite Safety Manager from BP/Moran to supervise these anchor lifts. The boat operator is the equivalent of a foreman.

The BP Safety personnel were on the scene and observed me wet from head to foot and nothing was said. My foreman did not make out an accident report. No one asked me if I was hurt or needed any attention.

To this day I have no idea the extent of my injuries or what dangers the exposure to the water holds in store for me.

That night at 9 pm; quitting time for our 15 hour days; I was told that I was fired because of the accident. The next day I was not allowed any more work and the next three days revealed that I was blacklisted and not allowed to work anywhere. Despite having a great deal of experience and the proper credentials I have not worked one day since.

## THE JET BOAT WAS UNSEAWORTHY
## FOR ITS USE ON MAY 12th, 2010

The Jet is a homemade watercraft that is approximately 25 years old. It was made, and it is maintained, as a hunting vessel used in the shallow rivers of Mobile and Baldwin Counties, in Alabama. The captain on that vessel made arraignments for BP to lease the Jet from his friend who is the owner/builder of the Jet. The Jet

has only one non-skid surface on it and that is a piece of seriously weathered ply-wood loosely attached as a deck. The rails, the stern area and the bow area are painted in slick grey epoxy paint and are devoid of any traction devices or "non-skid" tape to prevent slipping, falling or sliding. There are no hand rails nor is there a designated work surface. The Jet was not designed for, nor would it ever be accepted for, use in the rough waters of Perdido Pass and especially not the rough waters of the Gulf of Mexico.

Mechanically the Jet would not idle so it had to be restarted and revved going into gear: either forward or backward. The engine could not be reliably used to hold position while work was being attempted.

As for hoisting and pulling anchors the Jet had no lifts, davits, hoists or even pulleys and blocks. There was no way to lift and secure the anchors except by hand and that involved kneeling on the deck or standing on the slick surfaces while the boat pitched, swayed and strayed around the area of work . That method put the deckhands in a constant strain between the Booms being pushed by the seas and currents and the anchors heavily restrained to the bottom of the Pass and the mean-dering and pitching boat[6].

---

[6] "[t]he remedial scheme created by Congress … to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Nunez v. B & B Dredging, Inc.,* 288 F.3d 271 (5th Cir. 2002)( Rehearing Denied May 21, 2002)

There was no overhead cover to work under as is required by the Occupational Safety and Health Administration (OSHA) making fatigue from the sun a constant and dangerous factor. By the time of the accident we, the crew, had been working for eleven hours[7] under the direct effects of the sun and that had affected the abilities of the captain and the Safety Manager. I had been working for two days prior to the accident, at 15 hours per day, and the other deckhand had been working for a week prior and the captain had been working for several weeks prior to the accident, under the direct effects of the sun.

General fatigue was another constant factor in that the Captain of the vessel that I was on Wednesday the 12th of May, 2010, was working 15-16 hours per day plus his off time work causing him to come to work with little or no sleep every day. The Captain was groggy and lethargic and hard to understand. He did not give clear commands and in most cases failed to give any commands at all.

BP and Moran were required to issue Safety Harnesses and a method to secure them and they did not.[8] My accident would have been prevented by the use of any safety device to prevent me from going over the side.

---

[7] "OSHA rule 29CFR 1910.132(a) requires employers to protect employees against overexposure to the sun's radiation." The "General Duty Clause," Section 5(a)(1) of the Occupational Safety and Health Act of 1970, requires each employer to, "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm." OSHA has previously used the General Duty Clause to cite employers that have allowed employees to be exposed to potential serious physical harm from excessively hot work environments. OSHA states that in order to prevent these heat-related illnesses, you should block out direct sun, stay in the shade and use cooling fans or air-conditioning.
[8] The personal protective equipment standards at 29CFR 1910.132 through .138 establish the employer's obligation to provide personal protective equipment to employees (at the employer's expense)".

## THE DEFENDANTS

This is a list of the defendants named in the above styled action.  As I have pointed out the Supreme Court has interpreted causes involving fraud to be developed with a little more specificity than normal claims of negligence.  These claims are non-exhaustive and are only made to the best of my knowledge and belief at the time of this writing so as to comply with Rule 9, F.R.Civ.P.  I fully expect that the discovery process will further illuminate the wrong doings of the defendants.

British Petroleum (BP) is an international energy conglomerate that has its North American Headquarters at: 501 Westlake Park Boulevard, Houston, TX 77079.  Phone: (281) 366-2000.

BP does not maintain any offices in Alabama.  Their web page confirms this: http://www.bp.com/contacts.do?categoryId=488&contentId=2000552

Moran Environmental Recovery, LLC: has its Corporate Headquarters at 251 Levy Road, in Atlantic Beach, FL 32233.Telephone Numbers Toll Free: 800-359-3740Main: 904-241-2200; Fax Numbers General: 904-241-4732; Operations: 904-241-4906 Estimating: 904-247-0188.  The President of the company is Brian J. House.  The web address confirms that they do not have any offices in Alabama:

http://www.moranenvironmental.com/CMSLite/default.asp?CMSLite_Page=79&Info=Locations.

### PRAYER FOR RELIEF

For all of the foregoing I am requesting that this Honorable Court direct this action to a trial before a jury.  That upon the finding of the jury in my favor that this Honorable Court direct the defendants to pay me $1,000,000.00 each for my losses, damages, pain, suffering, emotional distress and harms to my life.

Respectfully submitted on this 21st day of May, 2010.  By,

Michael Henry Smith
4038 Sierra Drive
Mobile, Alabama
36693-5500
michael.eaglescout.smith4@gmail.com
(251) 802-8513